[Sac. No. 7884. In Bank. Mar. 25, 1971.]

CALIFORNIA WELFARE RIGHTS ORGANIZATION et al.,
Petitioners, v.
ROBERT B. CARLESON, as Director, etc., et al., Respondents.

[Sac. No. 7887. In Bank. Mar. 25, 1971.]

CALIFORNIA WELFARE RIGHTS ORGANIZATION et al.,
Plaintiffs and Respondents, v.
ROBERT B. CARLESON, as Director, etc., Defendant and Appellant.

(Consolidated Cases.)

**COUNSEL**

Evelle J. Younger, Attorney General, N. Eugene Hill and Jay S. Linderman, Deputy Attorneys General, for Respondents and Defendant and Appellant.

Peter Sitkin, Ralph Santiago Abascal, Sidney M. Wolinsky, Valerie Vanaman and Daniel S. Brunner for Petitioners and for Plaintiffs and Respondents.

Karlton & Blease and Coleman A. Blease as Amici Curiae on behalf of Petitioners and Plaintiffs and Respondents.

**OPINION**

**BURKE, J.**—These two consolidated cases involve the amounts of and standards for computing welfare grants made under the Aid for Dependent Children (AFDC) program, and the authority and obligations with respect thereto of the Director of the California Department of Social Welfare.[1]

In Sac. No. 7887, in an action brought by certain recipients of AFDC

---

[1]Robert Carleson, the present director, has been substituted as a party to these cases, in place of former Director Robert Martin.

grants and by an unincorporated association,[2] the Superior Court of Sacramento County issued a preliminary injunction enjoining the director from implementing or enforcing certain regulations he had issued relating to AFDC grant payments.[3] The director appeals, and has also sought to halt further proceedings below. We issued the alternative writ of prohibition.

In Sac. No. 7884 the petitioners are the same parties as the parties plaintiff in the superior court action in Sac. No. 7887; i.e., certain recipients of AFDC grants and an association undertaking to represent them. (See fn. 2, *ante.*) Petitioners seek mandamus to (1) compel respondent Director of the California Department of Social Welfare to set aside certain of the regulations above mentioned and to increase the AFDC grants; and (2) compel respondent Director of the Department of Finance to authorize expenditures for such increased AFDC grants.[4] We issued the alternative writ.

As will appear, we have concluded that those regulations pertaining to the food allowance of AFDC grants and to the imposition of a "percent reduction" to the total budgetary needs of recipients are invalid because in violation of California statutes, but that the regulation establishing new and increased schedules of maximum grants is authorized and should be upheld.

Section 401 of the Social Security Act (42 U.S.C. § 601) makes federal funds available "for making payments to States which have submitted, and had approved by the Secretary [of Health, Education, and Welfare], State plans for aid and services to needy families with children."

These cases arose out of California's undisputed failure, prior to the orders referred to in footnote 3, *ante,* to take steps to bring about cost-of-living adjustments required by section 402(a)(23) of the Social Security Act as amended in 1968 (42 U.S.C. § 602(a)(23))[5] if California's plan

---

[2]Viz., the California Welfare Rights Organization, which alleges that it "initiates litigation on behalf of . . . all welfare recipients in the State of California."

[3]The regulations were issued in response to orders of the United States District Court, Northern District of California, made in the fall of 1970, in an action brought by various recipients of AFDC grants. That court ruled that California was out of conformity with certain requirements imposed by the federal Social Security Act upon states participating in the AFDC program, and ordered the director to adjust grant schedules as a condition of further receipt by California of federal AFDC funds. As more fully discussed later in this opinion, the federal Department of Health, Education, and Welfare has similarly ruled that California was out of conformity.

[4]Hereinafter in this opinion the term "director" will refer to the Director of the Department of Social Welfare, unless otherwise stated.

[5]Section 402(a)(23) as amended in 1968 declares that a state plan must, inter alia, "provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such

was to remain eligible for federal funds; neither the maximums set forth in subdivision (a) of section 11450 of the Welfare and Institutions Code,[6] last adjusted in 1961,[7] nor the need standards fixed under section 11452 of the same code[8] had been adjusted to reflect current increased living costs.

However, in response to the orders to which we adverted in footnote 3, *ante,* the director, on November 19, 1970, promulgated emergency regulations designated as EAS sections 44-212, 44-313 and 44-315. EAS 44-212 revised the dollar amounts employed in computing family budgets to meet the need standards under section 11452 (see fn. 8, *ante*); EAS 44-313 raised the maximums stated in section 11450, subdivision (a)

---

amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

[6]Section 11450, subdivision (a): "(a) For each needy family which includes one or more needy children qualified for aid [for dependent children] . . . there shall be paid the sums specified in the following table, or so much thereof as is necessary for the adequate care of the needy family:

| | Maximum aid |
|---|---|
| "Number of needy children in the same home | |
| 1 child | $145 |
| [The maximum aid amounts if from 2 children to 8 children are here stated.] | |
| 9 children | 371 |

Plus five dollars ($5) per child for each additional child.

"If, when and during such times as the United States government increases or decreases its contributions in assistance of needy children in this state above or below the amount paid on January 1, 1961, the amounts specified in the above table shall be increased or decreased by an amount equal to such increase or decrease by the United States government."

[7]See former section 1511, Welfare and Institutions Code; statutes 1961, chapter 1396, page 3912, section 1.

[8]Section 11452: "Minimum basic standards of adequate care shall be distributed to the counties [which are enjoined by § 11207 to grant AFDC aid "in any amount needed, not to exceed the amount specified in Section 11450"] and shall be binding upon them. Such standards shall be determined by the rules and regulations of the department [of Social Welfare], to insure:

"(a) Safe, healthful housing.

"(b) Minimum clothing for health and decency.

"(c) Low cost adequate food budget meeting recommended dietary allowances of the National Research Council adapted to prices of the area in which the recipient resides.

"(d) Utilities in accordance with the basic minimum need.

"(e) Other items verified as needed, including household operation, education and incidentals, recreation, personal needs, and insurance.

"(f) Allowance for essential household furniture and equipment.

"(g) Allowance for essential medical, dental, or other remedial care when not available through a public facility.

"(h) Allowances for special needs for any one or more of the following items: special diets upon the recommendation of physician, transportation, laundry, housekeeping service, and telephone; and utilities in excess of the basic minimum need."

(fn. 6, *ante*); and EAS 44-315 provided that AFDC grants would be limited to 69 percent of a family's minimum need.

Meanwhile, in August 1970 the U. S. Department of Health, Education, and Welfare (HEW) held a hearing on the questions of whether California's plan complied with the requirements of the Social Security Act and whether further federal grants could be made to California. On January 8, 1971, that department's decision was rendered. It held that California was out of compliance with the federal act in failing to update its maximums on AFDC grants, and ordered that further federal financial assistance for the California AFDC program be withheld until such time as the California AFDC plan conforms to the requirements of section 402(a)(23) of the Social Security Act. The HEW decision relates, inter alia, that in December 1970 HEW had received amendments to the California plans (apparently emergency regulations EAS 44-212, 44-313, and 44-315) and had found them acceptable, but was aware that their validity was under challenge in the California courts.[9] Following issuance of the HEW decision, the decision was on the same day (January 8, 1971), withdrawn and rescinded by HEW at the request of California's Governor, pending final resolution of the litigation now before us in which validity of the emergency regulations is at issue.

In *Rosado* v. *Wyman* (1970) 397 U.S. 397 [25 L.Ed.2d 442, 90 S.Ct. 1207], the United States Supreme Court, faced with the task of interpreting section 402(a)(23) of the Social Security Act (*ante*, fn. 5), first noted (pp. 408-409 [25 L.Ed.2d at pp. 453-454]) that although states participating in the AFDC program must comply with the terms of the federal legislation, "the program is basically voluntary and States have traditionally been at liberty to pay as little or as much as they choose, and there are, in fact, striking differences in the degree of aid provided among the States.

"There are two basic factors that enter into the determination of what AFDC benefits will be paid. First, it is necessary to establish a 'standard of need,' a yardstick for measuring who is eligible for public assistance. Second, it must be decided how much assistance will be given, that is, what 'level of benefits' will be paid. On both scores Congress has always left to the States a great deal of discretion. [Citation.] Thus, some States include in their 'standard of need' items that others do not take into account. Diversity also exists with respect to the level of benefits in fact paid. [Fn. omitted.] Some States impose so-called dollar maximums on the amount

---

[9]The HEW decision further notes that "In order to comply with Section 402(a)(23), as interpreted in 45 CFR 223.20(a)(2)(ii), the State could have proportionately adjusted its maximums to reflect the change in living costs, or it could have abandoned its system of maximum payments in favor of a system of ratable reductions imposed on updated standards of need."

of public assistance payable to any one individual or family. Such maximums establish the upper limit irrespective of how far short the limitation may fall of the theoretical standard of need. Other States curtail the payments of benefits by a system of 'ratable reductions' whereby all recipients will receive a fixed percentage of the standard of need."

Turning to the language of section 402(a)(23), the court declared (pp. 412-414 of 397 U.S. [25 L.Ed.2d at pp. 455-456].) that "we find two separate mandates: First, the States must reevaluate the component factors that compose their need equation; and, second, any 'maximums' must be adjusted.

"We think two broad purposes may be ascribed to § 402(a)(23): First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402(a)(23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need.

"The congressional purpose we discern does not render § 402(a)(23) a meaningless exercise in 'bookkeeping.' Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions. In § 402(a)(23) Congress has spoken in favor of increases in AFDC payments. While Congress rejected the mandatory adjustment provision in the administration bill, it embodied in legislation the cost-of-living exercise which has both practical and political consequences.

"It has the effect of requiring the States to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions. Secondly, while it leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequences of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable. Lastly, by imposing on those States that desire to maintain 'maximums' the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat 'maximum' system, thereby encouraging those States desirous of containing their

welfare budget to shift to a percentage system which will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given."

With respect to the plan of the State of New York, which was at issue, the holding was that New York had "impermissibly lowered its standard of need by eliminating items that were included prior to the enactment of § 402(a)(23)." (P. 416 of 397 U.S. [25 L.Ed.2d at p. 457].)

Thus it appears clear that if regulations EAS 44-212 and 44-313 issued by the director (revising need standards and raising maximums) are valid under California law, then as related in the HEW decision (see *ante*, fn. 9 and accompanying text) they will serve to bring California's plan into conformity with section 402(a)(23), either standing alone or applied in conjunction with EAS 44-315 (applying a percent reduction). (See also *Dandridge* v. *Williams* (1970) 397 U.S. 471, 478, 482-483 [25 L.Ed.2d 491, 498, 500-501, 90 S.Ct. 153].)

However, recipients in the present cases contend that upon issuance of the HEW decision finding California to be out of compliance in failing to update its maximums set forth in section 11450, subdivision (a), Welfare and Institutions Code (fn. 6, *ante*),[10] then section 11003[11] rendered those maximums inoperative, and the director was without power or authority to impose new, albeit increased, maximums as undertaken by EAS 44-313; that the director similarly lacked authority to apply a percent reduction (EAS 44-315) to the new standard of need of EAS 44-212. The director, on the other hand, urges that his action in adopting the three emergency regulations were authorized under pertinent provisions of California law and were required in performance of his statutory duties.

The purpose of the AFDC program in California, as declared by the Legislature, is "To provide on behalf of the general public, and within the limits of public resources, reasonable support and maintenance for needy and dependent families and persons." (§ 10001, subd. (a).) Provision for the program made in the Welfare and Institutions Code is stated to be "a matter of statewide concern," and the Department of Social Welfare is designated "as the single state agency with full power to supervise every

[10]Hereinafter all section references are to the Welfare and Institutions Code unless otherwise stated.

[11]Section 11003: "If the United States Department of [HEW] issues a formal ruling that any section of this code relating to public assistance cannot be given effect without causing this state's plan to be out of conformity with federal requirements, the section shall become inoperative *to the extent* that it is not in conformity with federal requirements." (Italics added.) Section 11003 is the verbatim successor to former section 451, added to the Welfare and Institutions Code in 1961. (Stats. 1961, ch. 1971, p. 4150, § 1.)

phase of the administration of the public social services [including AFDC] for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws." (§ 10600.)

Other provisions deal with the director's power and authority to manage the department and to issue regulations (§§ 10553, 10554),[12] as well as with the scope of the authorized regulations. (§ 10060.)[13]

Additional provisions direct the department to establish regulations with respect to funds appropriated for welfare purposes, including AFDC (§ 10604),[14] and also deal with the department's general authority vis-à-vis the federal government. (§§ 10609, 10613.)[15]

We are told that some 400,000 needy families in California presently receive benefits under the AFDC program, that the present annual cost of operating the program approximates one billion dollars with about one-half of the funds being contributed by the federal government. In addition to the provisions of sections 10609 and 10613 (*ante,* fn. 15), this court has taken judicial notice of the public policy of this state to establish and to maintain conformity between state law and the requirements of the federal

---

[12]Section 10553: "The director shall:

"(a) Be responsible for the management of the department.

"(b) Administer the laws pertaining to the administration of public social services.

"(c) . . . . . . . . . . . . . . . . . . . . . . .

"(d) Formulate, adopt, amend or repeal regulations and general policies affecting the purposes, responsibilities, and jurisdiction of the department and which are consistent with law and necessary for the administration of public social services. . . ."

Section 10554: "The director is the only person authorized to adopt regulations, orders, or standards of general application to implement, interpret, or make specific the law enforced by the department . . . ."

[13]Section 10060 in pertinent part: " 'Regulations' includes but is not limited to standards of eligibility for aid and services. . . ."

[14]Section 10604: "In administering any funds appropriated or made available to the department . . . for welfare purposes, the department shall: . . . (b) Establish regulations, not in conflict with the law fixing statewide standards for the administration of all state or federally aided public social service programs, defining and controlling the conditions under which aid may be granted or refused. . . ."

[15]Section 10609: "The department may act as the agent or representative of or cooperate with the federal government in any matters within the scope of the functions of the department, for the administration of federal funds granted to this state or for any other purpose in furtherance of those functions. . . .

"Any . . . agreement entered into by the department with the federal government . . . for the expenditure of any funds in the exercise of any power granted to the department by this section shall be subject to approval by the State Department of Finance."

Section 10613: "The functions of the department may include the administration and the supervision of the administration of public social services within this state as an agent of the federal government . . . ."

act for the receipt of grants-in-aid in support of the state public assistance programs, and that those programs are of tremendous financial and social consequence to this state. (*Pearson* v. *State Social Welfare Board* (1960) 54 Cal.2d 184, 189 [5 Cal.Rptr. 553, 353 P.2d 33].)

The specific amounts of the needs standards, revised by the director by emergency regulation EAS 44-212, have been set from time to time by administrative regulation for the items specified by the Legislature in section 11452 (*ante,* fn. 8) and in response to that section's directive. However, the maximum grant schedules have been set by the Legislature in section 11450, subdivision (a), and its predecessor sections,[16] and until the present situation arose have been adjusted by the director only as authorized in section 11450, subdivision (a), itself, i.e., upon increase or decrease in the federal contribution. (See *ante,* fn. 6.)

California has never employed a percent reduction system in limitation of the amount of the need standard to be paid. The director contends nevertheless that emergency regulation EAS 44-313 raising the maximums in order to bring California into conformity with section 402(a)(23) of the Social Security Act, and emergency regulation EAS 44-315 limiting AFDC grants to 69 percent of minimum need, were authorized and required in order to insure continued conformity of the California plan as well as to adhere to the fiscal realities of the 1970 California Budget Act. (Stats. 1970, ch. 303, p. 581.) The director estimates that payment of full need amounts, as revised by emergency regulations EAS 44-212, without the percent reduction of EAS 44-315 but subject to the increased maximum schedule of EAS 44-313 would increase the cost to the state for operation of the AFDC program during fiscal 1970-71 to an amount greatly in excess of the specific appropriation by the Legislature in the 1970 Budget Act, and, further, that with neither the percent reduction of EAS 44-315 nor any schedule of maximums the cost to the state would rise even more.

### *The Maximums* (EAS 44-313)

██ As stated, recipients contend that the HEW ruling that California was out of conformity in not updating its maximums (see *ante,* fn. 9) triggered the provisions of section 11003 (*ante,* fn. 11), and thereby rendered the entire maximum structure of section 11450, subdivision (a), inoperative.

---

[16]See Statutes 1939, chapter 1037, page 2842, section 6; Statutes 1947, chapter 1143, page 2599, section 2; Statutes 1951, chapter 1533, page 3512, section 3; Statutes 1957, chapter 2293, page 3994, section 3; Statutes 1961, chapter 1396, page 3192, section 1.

In our view this contention proves too much. Section 11003 specifies only that a section ruled by HEW to be out of conformity "shall become inoperative *to the extent* that it is not in conformity . . . ." (Italics added.) In the context of the present litigation, and of the involved HEW ruling, section 11450, subdivision (a), was out of conformity only *to the extent* that the maximums had not been adjusted upward in response to the requirements of section 402(a) (23) of the Social Security Act. Accordingly, pursuant to the provisions of section 10600 (Welf. & Inst. Code) designating the Department of Social Welfare as the agency "with full power to supervise every phase of the administration of . . . [AFDC] in order to secure *full compliance with* the applicable provisions of state and *federal laws"* (italics added), the authority of the director to adjust the maximums as necessary to bring California into compliance with federal law would appear clear. As noted, California has consistently and for many years operated under maximum grant schedules (see fn. 16, *ante*), and it would seem patently unreasonable to conclude that the Legislature intended that such schedules be completely eliminated when, as here, California's plan could be brought into compliance without that heroic extreme. Accordingly, we hold that EAS 44-313 fell within the director's authority and is valid.

### *The Percentage Reduction* (EAS 44-315)

However, no such saving provisions are to be found in the Welfare and Institutions Code with respect to the percent reduction attempted by the director through emergency regulation EAS 44-315; certainly the imposition of such a reduction was in no sense necessary in order to bring California's plan into conformity. "Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].)

The director contends, however, that he was required by the 1970 Budget Act to confine AFDC expenditures within the appropriation made therefor by the Legislature, and to that end was compelled to impose the percent reduction on the increased standard of need of EAS 44-212. Pertinent provisions of the 1970 Budget Act (Stats. 1970, ch. 303, p. 581) relied upon by the director are set forth in the margin.[17]

---

[17]For convenience of reference to certain of the following provisions of the 1970 Budget Act we have sometimes inserted paragraph numbers; e.g. [*Par. 1*].
"Sec. 2. The following sums of money, or so much thereof as may be necessary

The director points particularly to the Budget Act provisions appropriating specific numbers of dollars for the support of the department (Item 132) as well as for the state's share of the public assistance programs

---

unless otherwise provided herein, are hereby appropriated for the use and support of the State of California for the 1970-71 fiscal year . . .

"Item

"1 [through Item 131]

"132—For support of Department of Social Welfare. Such appropriation, together with any grants made available by the federal government for support of the Department . . . during the 1970-71 fiscal year ....................... 19,692,982

"Schedule:

"(a) Personal Services ...................... 19,696,926
"(b) Operating Expenses and Equipment ....... 12,695,293
"(c) Reimbursements .......................— 1,742,765
"(d) Federal grants ........................—10,956,472

provided, that any rule or regulation adopted by the [Social Welfare] Director . . . during the 1970-71 fiscal year which adds to the cost of any public assistance program shall only be effective from and after the date upon which it is approved as to availability of funds by the Department of Finance. All such additional costs shall be reported by the Department of Finance to the Joint Legislative Budget Committee quarterly. . . .

"[Item] 279—Notwithstanding the provisions of Sections 15200 [through] 15204 of the Welfare and Institutions Code [those sections appropriate to the counties "out of any money in the State Treasury not otherwise appropriated" varying percentages of the cost of various public assistance programs, after deducting federal funds available, including 67.5 percent of AFDC costs], there is hereby appropriated the following sum for the state's share of public assistance programs as defined in [certain chapters of the Welfare and Institutions Code, including the AFDC program] .. 634,846,200 [*Par. 1*] provided, that the Department of Social Welfare, subject to the limit placed on aggregate expenditures by this *section* [*sic*], may transfer funds between the programs specified in the following schedule, when the need appears, but shall, subject to the provisions of this item, limit expenditures to the total of the following schedule:

"Schedule:

"(a) Aid to the Blind ...................... 8,716,800
"(b) Aid to the Potentially Self-Supporting Blind .. 655,000
"(c) Aid to the Needy Disabled ............... 117,687,300
"(d) Aid to Families With Dependent Children ... 342,405,400
"(e) Old Age Security ...................... 165,381,700

[Total 634,846,200]

"[*Par. 2.*] The Department of Social Welfare shall administer the public assistance programs so that the counties will bear no more than the amount of welfare costs that they would be obligated to bear under the applicable provisions of the Welfare and Institutions Code, without the expenditure limitations set forth herein, and so that the amount authorized to be expended under this *section* [*sic*] shall fully cover the state's share of aid payments and for services under such programs for the 1970-1971 fiscal year.[*]

[*NB. Section 11207, Welfare and Institutions Code, provides that "Every county shall grant aid to any child eligible therefor, in any amount needed, not to exceed the amount specified in [the maximum schedules of] Section 11450 . . . ."]

(Item 279), including a specific amount for AFDC, and urges that the restrictive language of Items 132 and 279 (pars. 3 & 4), and of section 32, permits expenditures in excess of those amounts only upon approval by the Director of Finance. It is undisputed that the latter has declined to approve excess expenditures and has projected a deficit in the General Fund for the fiscal year. Both directors also argue that the excess expenditures which it is estimated would result from payment of the increased basic need standard of EAS 44-212, absent the percentage reduction of EAS 44-315, are not the type of excess expenditures which the Director of Finance is authorized to approve; i.e., are not "amounts made necessary by changes in either caseload or payments, or both, unrelated to any change in rule or regulation adopted during the current fiscal year." (Item 279, par. 4.)

The Director of Social Welfare also represents that no funds are available for transfer to the AFDC program from any other public assistance program under the authority of Item 279 (par. 1).

Recipients, on the other hand, contend that any excess expenditures flowing from the adjusted need standard fall within the Finance Director's authorization to approve, that Item 279 (par. 4) provides an "open-ended" appropriation by the Legislature to make such expenditures, and that in any event the Social Welfare Director lacks the power or authority to

---

"[*Par. 3.*] The limitations on amounts imposed by this item shall apply to any amounts which are determined by the Director of Finance to be necessary to meet increases in cost arising out of approvals made by the Department of Finance pursuant to the provisions contained in Item 132 [*ante*].

"[*Par. 4.*] Provided further, that in order to avoid any resultant and inequitable increase in local property taxes, the Director of Finance is authorized to approve expenditures in those amounts made necessary by changes in either caseload or payments, or both, unrelated to any change in rule or regulation adopted during the current fiscal year, which are in excess of Budget Bill estimates for 1970-71 and funds necessary to make such expenditures are hereby appropriated in addition to any other appropriation contained in this item. Not later than the fifth legislative day following the submission of the Governor's Budget in the 1971 Regular Session of the Legislature, the Director of Finance shall report to the Legislature the amount, if any, by which the then current estimate of the amounts to be paid to the counties under the formulas set forth in [sections 15200 through 15204] of the Welfare and Institutions Code for the fiscal year ending June 30, 1971, will exceed $634,846,200. If such report is not required following submission of the Governor's Budget but the Director of Finance determines during the third quarter that the estimate of expenditures will exceed $634,846,200, he shall so report to the Legislature prior to the end ' of the third quarter.

"Sec. 32. The officers of the various departments . . . for whose benefit and support appropriations are made in this act, are expressly forbidden to make any expenditures in excess of such appropriations, except the consent of the Department of Finance be first obtained, and a certificate, in writing, duly signed by the director of said department, of the unavoidable necessity of such expenditure . . . ."

impose a percent reduction on the need standard. Recipients seek to compel the Finance Director to approve any excess expenditures incident to payment of the adjusted need standard.

We are unable to discern in any of the provisions of the 1970 Budget Act a legislative intent to bestow upon the Director of Social Welfare the power to convert the California plan from one of payment of full need but subject to schedules of maximums, into a plan for payment of full need but subject to a percent reduction system whether or not accompanied also by maximum schedules. As noted, California has at no time operated under a percent reduction plan, and in our view the conversion to such a plan would require a clear expression of intent by the Legislature. No such expression is to be found in either the Welfare and Institutions Code or in the various restrictive pronouncements of the 1970 Budget Act.

We recognize that the Social Welfare Director may well be confronted with a dilemma not of his own choosing if payment of the revised need standard of EAS 44-212, subject to the adjusted maximum schedule of EAS 44-313 but *not* to the percent reduction attempted by EAS 44-315, does result in exhaustion of the specific appropriation for AFDC made in Item 279 (par. 1), as he now estimates will occur if the Director of Finance does not approve excess expenditures. However, there is no showing or suggestion that the limits of the specific appropriation have as yet been reached, and accordingly we need not now determine whether the Director of Finance is authorized to approve any excess expenditures flowing from implementation of EAS 44-212 and EAS 44-313, unaccompanied by the percent reduction of EAS 44-315, nor whether the 1970 Budget Act provided an "open-end" appropriation of funds necessary to make any such approved excess expenditures. If the specific appropriation is exhausted before the end of fiscal 1970-71 and if the Director of Finance fails to approve excess expenditures, then solution of any resulting AFDC crisis should be sought from the Legislature which may either provide supplemental specific appropriations for the program or if need be may authorize conversion to a percent reduction plan in order to accommodate fiscal realities. Certainly no basis has been shown for compelling the Director of Finance to approve expenditures in excess of the specific appropriation of the 1970 Budget Act. The Department of Finance is given general powers of supervision over all matters concerning the financial and business policies of the state (Gov. Code, § 13070), with the purpose of conserving "the financial interests of the state, to prevent improvidence, and to control the expenditure of state money by any of the several departments of the state." (*State* v. *Brotherhood of R. R. Trainmen* (1951) 37 Cal.2d 412, 422 [232 P.2d 857].) A clear legislative mandate

to the Finance Director is a prerequisite to interference by this court with the exercise by him of his assigned functions, and no such mandate is apparent from the provisions of the 1970 Budget Act.

It appears regrettable that the Legislature has not provided clear direction to the Director of Social Welfare for his guidance in such circumstances as are presented in this litigation. Having enjoined upon the counties the payment of full needs subject only to maximum schedules but not to a percent reduction system (§ 11207, see *ante,* note in fn. 17), and upon the director the supervision of the administration of AFDC in order to secure full compliance with state and federal laws (§ 10600) as well as to avoid imposing upon the counties a greater share of welfare costs than they would bear absent the expenditure limitations of the 1970 Budget Act (see Item 279, par. 2), the Legislature has failed to lay down directives providing authority to reconcile these various instructions when, as here, they appear to conflict. However, it is not the function of this court to legislate, and in the premises we deem it appropriate to refer the Director of the Department of Social Welfare to the Legislature for relief.

Accordingly, we hold emergency regulation EAS 44-315, undertaking to impose a percent reduction upon the basic need standard of EAS 44-212, to be invalid.

### *Food Standard Set by EAS 44-212*

One of the elements of the standard of need which the Legislature has directed be determined by regulation is "Low cost adequate food budget . . . adapted to prices of the area in which the recipient resides." (Subd. (c) of § 11452; *ante,* fn. 8.) Regulation EAS 44-212.3 as promulgated effective March 1, 1970, established food needs which (1) differentiated between individuals on the basis of their age and sex, and (2) varied between five different pricing areas or "County Pricing Groups." For example, the amount ran from a low of $19.80 monthly for children through six years of age in Group 1, to a high of $39.95 for males 13 years and over in Group 4a.

However, emergency regulation EAS 44-212.3 of November 1970, now at issue, establishes a single standard of need, applicable throughout the state, of $44.45 per person per month, exclusive of housing and utility needs (which continued with geographical variation) for all needs including food. It is apparent that the new single uniform statewide food standard will result in increasing the total need standard of some AFDC recipients, while decreasing that of others.

Those recipients whose standard will be reduced complain that the new

EAS 44-212.3 averages the cost of food on a statewide basis in violation of section 11452, subdivision (c), and so is invalid. We agree.

It is undisputed that the statewide food allowance was established through means of a "weighted average" which took into consideration, inter alia, the various county pricing groups as well as the number of persons in each age group in each pricing area. This plainly does not constitute an adaptation of the food budget allowance to "prices of *the* area in which *the* recipient resides" (italics added) as required by section 11452, subdivision (c). Averaging prices on a statewide basis fails to meet the statutory direction that a recipient's food allowance be adapted to the area of his own residence.

In Sac. No. 7887 the superior court issued a preliminary injunction enjoining defendant Director of the Department of Social Welfare from implementing or enforcing emergency regulations EAS 44-212 and 44-315. That order is affirmed with respect to EAS 44-315, and affirmed with respect to the food component of EAS 44-212. The alternative writ heretofore issued in Sac. No. 7887 is discharged and the peremptory writ denied.

Inasmuch as the issues presented in this controversy have been resolved, and all appropriate relief accorded, in Sac. No. 7887, no useful purpose would be served by further proceedings in Sac. No. 7884. Accordingly, the alternative writ of mandate issued in Sac. No. 7884 is discharged and the peremptory writ denied.

Each side shall bear its own costs on appeal.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.