[Civ. No. 46678. First Dist., Div. One. Mar. 10, 1981.]

CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION,
Plaintiff and Appellant, v.
KING CITY UNION ELEMENTARY SCHOOL DISTRICT,
Defendant and Respondent.

COUNSEL

Mary H. Mocine, Madalyn J. Frazzini, Charles L. Morrone, Michael Heumann, Ruth Rokeach, Peter A. Janiak, E. Luis Saenz, Maureen C. Whelan and Siona D. Windsor for Plaintiff and Appellant.

Iver E. Skjeie, County Counsel, and Paul R. De Lay, Deputy County Counsel, for Defendant and Respondent.

OPINION

**ELKINGTON, Acting P. J.**—California School Employees Association and its Chapter 494 (hereafter in the singular, CSEA) has appealed from a judgment denying its petition for a writ of mandate against the King City Union Elementary School District (hereafter District).

The appeal is taken on the superior court clerk's transcript. The record therefore consists of the pleadings, findings of fact and conclusions of law, and judgment. (*Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 226 [69 Cal.Rptr. 251].) We are not concerned with the oral and documentary evidence adduced in the superior court (*id.*, p. 226), because the "sufficiency of the evidence to support the findings is not open to review" (*Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 454 [85 Cal.Rptr. 809, 467 P.2d 537] [cert. den., 400 U.S. 807 (27 L.Ed.2d 37, 91 S.Ct. 65)]).

We accordingly state the material facts as they, and reasonable inferences therefrom, appear from the superior court's findings.

The District had employed "teacher aides," a *classified* employment in its school system, under its "Board Policy 420.7" adopted in 1974, which as relevant provided that: "All [teacher] aides will work each day that school is in session." The teacher aide program depended entirely upon the state for its funding. In August of 1976 the District was

advised by the state that the program's funding would be reduced by the approximate yearly amount of $15,700. The reduced funding was insufficient for continued full support of the ongoing program. The District accordingly, "at an open regular meeting of its governing board" decided to "lay off" all teacher aides "for two weeks during the course of the [imminent] 1976-1977 school year, one week at the commencement and one week at the end of the year." Notice of the "two week layoff" was given the affected teacher aides in writing on August 31, 1976, a week before the first layoff commenced. The under-funding continued, and for the same reason the District on July 13, 1977, through its "governing board, in open session at a regular meeting, established a [teacher aide] work schedule for school year 1977-78, with the identical number of work days as in the prior year." More than 30 days' notice of that layoff was given the affected teacher aides.

The District's governing board had "assented to such layoffs" "by consensus . . . and directed the superintendent to reduce the 1976-77 and 1977-78 school years by two weeks by reason of continued reduced funding . . . ." "In each of the two school years affected, [teacher] aides continued to work six hours per day, five days per week as they had in prior years. No aide suffered a reduction in hours; rather, the work year was reduced by two weeks." The District's "governing board at no time relevant hereto voted to authorize the layoffs for [teacher] aides during the 1976-77 and 1977-78 school years but by consensus assented to such layoffs and directed the superintendent to reduce the 1976-77 and 1977-78 school years by two weeks by reason of continued reduced funding . . . ." The District's "governing board did not specifically rescind Board Policy 420.7, which states that the [teacher] aides shall work each day that school is in session and which was adopted on November 13, 1974, but its action in reducing the school years by two weeks by implication rescinded such policy." And, the affected teacher "aides laid off for two weeks during each of school years 1976-77 and 1977-78 at no time expressly waived their rights under the Education Code or under the Collective Bargaining Agreement executed on March 23, 1977."

It is significant, as noted above and as will hereafter be seen, that the trial court found, although the form of the District's action was spoken of in terms of layoff, in substance the teacher aides' "*work year was reduced by two weeks.*" (Italics added.)

It will become significant also, as found by the trial court, that the District had by implication "rescinded" or at least modified its policy 420.7 by reducing the work year of teacher aides.

The District's resolution of the teacher aide funding problem was, at the time, apparently acceptable to all, the District, CSEA, the affected teacher aides, and their collective bargaining unit. For during the midst of the two reduced work years (eight months *after* the first layoff), a teacher aide collective bargaining agreement was entered into. The agreement made no complaint of the earlier layoff, and sought no correction of those destined to occur in the future. Indeed, the layoffs were unmentioned. The first complaint of them was almost 15 months later.

Instead, the collective bargaining agreement, as relevant, provided only that District "policies shall remain in effect for the life of the agreement (July 1, 1976 to June 30, 1978) '. . . to the extent not inconsistent with this agreement, state or federal law.'" At the time, the District's policy 420.7, that teacher aides "will work each day that school is in session," had been *modified* to the extent that teacher aides, while the underfunding continued, would be employed for the necessarily shortened school year.

California's Legislature has expressed the state's public policy that its classified school employees shall not be employed when there is no existent funding with which to pay them. The policy is exemplified by Education Code section 45117, which, as relevant, provides:

"(a) When, as a result of the expiration of a specially funded program, classified positions must be eliminated at the end of any school year, and classified employees will be subject to *layoff for lack of funds*, the employees to be laid off at the end of such school year shall be given written notice on or before May 29 informing them of their layoff effective at the end of such school year and of their displacement rights, if any, and reemployment rights. However, if the termination date of any specially funded program is other than June 30, such notice shall be given not less than 30 days prior to the effective date of their layoff." (Italics added.)

Education Code section 45308 iterates: "Classified employees shall be subject to layoff for lack of . . . funds. . . ."

And a "'Layoff for lack of funds . . .' [under some circumstances] includes any reduction in hours of employment . . . ." (Ed. Code, § 45101, subd. (g).)

■ We interpret what appears to be CSEA's principal contention as an argument that the District's voluntarily adopted Board Policy 420.7, providing that teacher aides "will work each day that school is in session," transcends its later modification and any application of the above-noted state's public policy and statutes.

The contention is manifestly unsound.

To the extent that the District's policy lacked conformity "to the legislative will," it was *void.* (*California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 455 [93 Cal.Rptr. 758, 482 P.2d 670]; *Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697]; *Hypolite* v. *Carleson* (1973) 32 Cal.App.3d 979, 983 [108 Cal.Rptr. 751] [cert. den., 415 U.S. 934 (39 L.Ed.2d 492, 94 S.Ct. 1449)].)

■ Another appellate contention of CSEA is that the parties' collective bargaining agreement, providing that the District's "policies shall remain in effect for the life of the agreement," found by the court to be "incorporated into said agreement," was binding upon the District.

We agree, but only insofar as the above language had been *modified,* and the policy was not inconsistent with *"state or federal law."* (Italics added.) Insofar as the modified policy was inconsistent with the above-noted public policy and statutes, and the Legislature's funding commitments, it was inoperative under the collective bargaining agreement, by that document's terms.

■ It is next contended that the action of the District's governing board in ordering the layoffs was void for lack of compliance with Education Code section 35163.

Section 35163 provides: "Every official action taken by the governing board of every school district shall be affirmed by a formal vote of the members of the board, and the governing board of every school district shall keep minutes of its meetings, and shall maintain a journal of its proceedings in which shall be recorded every official act taken."

On this issue, and as previously noted, the trial court found that the District's governing board at "open regular meetings" had not "voted to authorize the layoffs . . . but by consensus assented to such layoffs" and directed the superintendent to reduce the teacher aide participation in the 1976-1977 and 1977-1978 school years accordingly. No contrary contention is made, and we may properly assume that the governing board kept proper minutes of the meeting, and recorded its official action in a journal of its proceedings as required by the statute.

The word "vote" has been variously defined. It may be an "aye" or "nay" response to a roll call, or it may be any "expression of wish, or choice, or preference," without regard to "the method through which that result was accomplished." (*Bourland* v. *Hildreth* (1864) 26 Cal. 161, 195; and see 44A Words and Phrases (1962) p. 4, "the formal expression of a will, preference, wish, or choice in regard to any measure proposed, . . .") "And the aggregate of the expressions of will or choice, thus manifested by individuals, is called the 'vote of the body.'" (Black's Law Dict. (4th ed. 1951) p. 1748, col. 1.)

■ Although differing reasonable inferences might be drawn from the trial court's related finding, we are obliged to resolve any uncertainty "'so as to support the judgment rather than to defeat it.'" (*Richter* v. *Walker* (1951) 36 Cal.2d 634, 639 [226 P.2d 593]; *Adams* v. *Young* (1967) 255 Cal.App.2d 145, 162 [62 Cal.Rptr. 877].) This rule is particularly applicable where, as here, the appeal is taken on the judgment roll or clerk's transcript. In such a case where conflicting reasonable inferences are possible "facts may be inferred which will support the judgment [and] such inference will be deemed to have been made." (*Borges Dusters, Inc.* v. *Southmost Aviation, Inc.* (1957) 152 Cal.App.2d 25, 27 [312 P.2d 712]; and see *Warburton* v. *Kieferle* (1955) 135 Cal.App.2d 278, 281 [287 P.2d 1]; *City of Signal Hill* v. *Wyse* (1935) 9 Cal.App.2d 641, 642 [50 P.2d 1076].)

■ We interpret the trial court's finding to mean that the District's governing body had effectively made its "formal expression of a will, preference, wish or choice with regard" to what it deemed a fiscally necessary layoff, which said action was formally entered in the minutes and permanently recorded in a journal kept for that purpose. So construed the instant contention is invalid.

We need not resolve the debated question whether section 35163's requirement is mandatory or directory. (See *Lucas* v. *Board of Trustees*

(1971) 18 Cal.App.3d 988, 992 [96 Cal.Rptr. 431].) Nor do we reach the question whether by informality the governing body of the District could fasten upon it a liability for salaries for which there was no funding, contrary to express statutory law and the state's public policy.

We nevertheless suggest that the District's governing board would be well advised to take its official actions by roll call of its members recorded on its minutes.

It is next contended that the teacher aide layoff was invalid "because the notice of reduction did not comply with the requirements of Education Code § 45117."

■ It will be remembered that section 45117, quoted in part above, required notice of the layoff "not less than 30 days prior to the effective date of [the] layoff." Here the District, as found by the court, gave the required notice seven days before the initial school year 1976-1977 layoff; the school year 1977-1978 layoff, as pointed out, was preceded by more than 30 days' notice. The instant complaint relates only to the school year 1976-1977 layoff.

The contention is manifestly invalid, for section 45117 additionally states: "(c) Nothing herein provided shall preclude a layoff for lack of funds in the event of an actual and existing financial inability to pay salaries of classified employees, ... resulting from causes not foreseeable or preventable by the governing board, without the notice required by subsection (a) ... hereof." Here, for lack of funds, a financial inability to pay anticipated salaries of the District's classified teacher aides, resulting from causes not foreseeable or preventable by its governing board, existed.

Contrary to CSEA's related argument the District's notices did substantially "provide employees with a statement of their reemployment rights," i.e., to their resumed employment at the end of each layoff.

■ Another contention of CSEA urges that the layoff was invalid "since it was imposed on all teacher aides involuntarily and without regard for their seniority."

Reliance is placed upon Education Code sections 45101, 45113, 45298 and 45308 dealing with layoffs of individual classified employees

for lack of funds or lack of work, and also with such individual employees "who take voluntary demotions or voluntary reductions in assigned time in lieu of layoff . . . ." They provide generally for the usual reemployment and promotional seniority rights when the causes of the layoffs and voluntary demotions and reductions are terminated.

Heavy emphasis is placed upon Education Code section 45101, subdivision (g), providing: "'Layoff for lack of funds or layoff for lack of work' includes any reduction in hours of employment or assignment to a class or grade lower than that in which the employee has permanence, voluntarily consented to by the employee, in order to avoid interruption of employment by layoff." It is argued that section 45101 prevented the two-week layoffs of the District's entire class of teacher aides, unless voluntarily consented to by the class.

We disagree. Section 45101, subdivision (g), by clear implication is calculated to protect *individual* employees who voluntarily accept reduction in hours of employment or assignment to a lower employment class or grade in their seniority rights vis-à-vis other employees. It does not purport to prevent, without consent, temporary or partial (as here) layoffs of an entire class for lack of funds.

A similar conclusion was reached in *California Sch. Employees Assn.* v. *Pasadena Unified Sch. Dist.* (1977) 71 Cal.App.3d 318, 324 [139 Cal.Rptr. 633], which dealt with section 45101's identical predecessor statute, Education Code section 13580.1 (superseded by § 45101, Apr. 30, 1977). The court held: "These sections clearly imply that the school district may reduce the time assignments of *specific* employees within a classification only with their consent, in lieu of layoff. . . . [¶] But this does not mean that there is no way for a school district to accomplish the objective of reducing the time assignments of [all] individual employees *within a classification.*" (Italics added.)

Moreover, as found by the trial court, the substance of the District's action was to reduce the teacher aides' "work year by two weeks" in order to meet the law's requirement that there be no employment of classified school employees whose salaries were not funded. We are of the opinion that neither the subject statute, nor any principle of law known to us, nor argument in reason, mandates that under such circumstances the work year may not be reduced except upon consent of the affected employees.

Nor do we find any statutory or other compulsion requiring the District, instead of ordering the two-week layoff for all of its fourteen teacher aides, to terminate one or more of them for the entire school year or permanently, thus rendering some teachers and classrooms without teacher aides at all.

It will further be noted that each employee of the class here subject to layoff by the District, retained such employment and promotional seniority rights as he or she may have had vis-à-vis other such employees, as guaranteed by the statutes here relied upon.

The judgment is affirmed.

Newsom, J., concurred.

**GRODIN, J., Concurring.**—I do not agree that the "formal vote of the members of the board" which Education Code section 35163 requires for "every official action" is satisfied by some undefined "consensus," particularly where the trial court finds that there was no "vote" at all. Nor is it satisfied by the fact (if it is a fact) that the board's action was recorded in the minutes of the board meeting and in the journal of its proceedings, since the requirement for recordation of official acts is imposed by section 35163 *in addition to* the requirement for "formal vote." To me, a formal vote means at least a procedure by which each member of the board indicates in some formal and express way his approval or disapproval of a pending proposition.

Nor do I agree that board policy 420.7 became inconsistent with state law simply because there was a reduction in funding for teacher aides. It is apparent, and at oral argument the board conceded, that the reduction in funding could have been accommodated by other means including, for example, the means now advocated by the union, i.e., by reduction in the number of teacher's aides.

The trial court determined, however, that the school board "received no protest in the 1976-1977 school year and had no reason to believe that a similar change in school year 1977-1978 was or would be a matter of protest or objection until a formal protest was made on February 8, 1978." By that time, of course, it was too late to effectuate the layoff-by-seniority alternative for which the union now contends, for the teacher aide (or aides) who would have lost employment altogether

by that alternative had already been employed. Under the circumstances, it could reasonably be said that the union was estopped from asserting its position, and on that ground I join in the result.

A petition for a rehearing was denied April 9, 1981. Grodin, J., was of the opinion that the petition should be granted.