[S.F. No. 24761. Mar. 21, 1985.]

ASSOCIATION FOR RETARDED CITIZENS—CALIFORNIA et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF DEVELOPMENTAL SERVICES et al.,
Defendants and Appellants.

COUNSEL

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Henry Torres, Jr., Deputy Attorneys General, for Defendants and Appellants.

Jay-Allen Eisen, David Rosenberg, Whitney Rimel Rogge, Felderstein, Rosenberg & McManus, Gilford M. Eastham and Paul Blake for Plaintiffs and Respondents.

Nancy E. Fleischer and Ralph Santiago Abascal as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

MOSK, J.—Plaintiffs, a number of organizations and individuals concerned with the condition of developmentally disabled persons, brought this action

for declaratory and injunctive relief against defendants, the Department of Developmental Services (DDS), its director (the Director), and another state agency and its secretary, alleging that certain spending directives issued by the Director were void. The court entered an order granting a preliminary injunction, and defendants appealed. (Code Civ. Proc., § 904.1, subd. (f).) ██ We conclude that the order should be affirmed.[1]

I

The Legislature has enacted a comprehensive statutory scheme known as the Lanterman Developmental Disabilities Services Act (hereinafter the Lanterman Act or the Act) (Welf. & Inst. Code, §§ 4500-4846)[2] to provide a "pattern of facilities and services . . . sufficiently complete to meet the needs of each person with developmental disabilities, regardless of age or degree of handicap, and at each stage of life." (§ 4501.) Such services include locating persons with developmental disabilities (§ 4641); assessing their needs (§§ 4642-4643); and, on an individual basis, selecting and providing services to meet such needs (§§ 4646-4647). The purpose of the statutory scheme is twofold: to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family and community (§§ 4501, 4509, 4685), and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community (§§ 4501, 4750-4751).

---

[1]Although by their terms the spending directives were in effect only until June 30, 1983, and were superseded by an emergency appropriation under compulsion of the injunction (Stats. 1983, First Ex. Sess., ch. 16, §§ 1, 24), we have concluded that this case is not moot. The issue of the validity of spending directives arose previously with regard to the 1981 Budget Act (see 64 Ops.Cal.Atty.Gen. 910, 916-918 (1981)), and has arisen here with regard to the 1982 Budget Act. Because this issue—one of conceded public importance and interest—has arisen in the past and is likely to arise in the future, we proceed to address it here. (E.g., *Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 539 [170 Cal.Rptr. 25, 620 P.2d 612]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 763 [150 Cal.Rptr. 785, 587 P.2d 227]; *Alternatives for California Women, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 436, 445 [193 Cal.Rptr. 384], and cases cited.)

[2]Unless otherwise noted, all statutory references hereinafter are to the Welfare and Institutions Code.

"Developmental disability" is defined in the Act as "a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature." (§ 4512, subd. (a).)

In the Lanterman Act "[t]he State of California accepts a responsibility for its developmentally disabled citizens and an obligation to them which it must discharge." (§ 4501.) In so doing, the Legislature has not only recognized that "[p]ersons with developmental disabilities have the same legal rights and responsibilities [as those] guaranteed all other individuals by the Federal Constitution and laws and the Constitution and laws of the State of California" (§ 4502), but has also granted them certain statutory rights, including the right to treatment and habilitation services at state expense. (See §§ 4502, 4620, 4646-4648.)[3]

To implement this scheme of statutory rights of developmentally disabled persons and the corresponding obligations of the state toward them, the Legislature has fashioned a system in which both state agencies and private entities have functions. Broadly, DDS, a state agency, "has jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons" (§ 4416), while "regional centers," operated by private nonprofit community agencies under contract with DDS, are charged with providing developmentally disabled persons with "access to the facilities and services best suited to them throughout their lifetime" (§ 4620).

Under the statutory scheme it is the regional centers, not DDS, that provide services to developmentally disabled persons and determine the manner in which those services are to be rendered. (See §§ 4620, 4630, 4648, 4651.) DDS has the authority to promote uniformity and cost-effectiveness in the operations of the regional centers. For example, DDS is responsible for developing uniform systems of accounting, budgeting, and reporting (§ 4631, subd. (a)), setting the rates for out-of-home care (§ 4681), and auditing and paying funds to the regional centers (§ 4780.5). In short, whereas the responsibility of the regional centers is broadly to provide each developmentally disabled person with services that enable him to live a more independent and productive life in the community (see §§ 4620, 4630, 4646-4648, 4651), the responsibility of DDS, as the Attorney General has concluded on other occasions, is basically limited to promoting the cost-effectiveness of the operations of the regional centers, and does not extend to the control of the manner in which they provide services or in general

---

[3]In *Youngberg* v. *Romeo* (1982) 457 U.S. 307, 309, footnote 1 [73 L.Ed.2d 28, 33, 102 S.Ct. 2452], the United States Supreme Court cited the following widely accepted definition of "habilitation": "The American Psychiatric Association explains: 'The word "habilitation," . . . is commonly used to refer to programs for the mentally retarded because mental retardation is . . . a learning disability and training impairment rather than an illness. [T]he principal focus of habilitation is upon training and development of needed skills.' " (Ellipsis in original.)

operate their programs (64 Ops.Cal.Atty.Gen., *supra,* 910, 916; 62 Ops.Cal.Atty.Gen. 229, 230-231 (1979); see §§ 4629, 4631, 4751-4753).

The rights of developmentally disabled persons and the corresponding obligations of the state toward them under the Lanterman Act are implemented in the Individual Program Plan (IPP) procedure. Under the Act, the regional centers are required to develop an IPP for each client. (§ 4647.) The IPP must be prepared and reviewed and, if necessary, modified at least annually, and must include the following: an assessment of the client's capabilities and problems; a statement of time-limited objectives for improving his situation; a schedule of the type and amount of services necessary to achieve these objectives; and a schedule of periodic review to insure that the services have been provided and the objectives have been reached. (§ 4646.) While it is true, as the Attorney General has observed, that the regional centers have "wide discretion" in determining *how* to implement the IPP (62 Ops.Cal.Atty.Gen., *supra,* 229, 230; see § 4648), they have no discretion at all in determining *whether* to implement it: they must do so (§ 4648).

## II

Fearing a shortfall in funding in the 1982-1983 fiscal year, the Director issued spending directives, entitled "Priorities for Regional Center Expenditures" (the Priorities), to insure that the regional centers would not exhaust their appropriations before the end of the fiscal year. In the Priorities the Director required the regional centers in effect to cut back services by category, without regard to the individual client's IPP. Specifically, he designated a few categories of services as "basic and essential," and required the regional centers to provide them "[t]o the degree funds are available," and, unless there was a special showing in an individual case, to provide no others. Plaintiffs filed this action to challenge the validity of the Priorities.

## III

The scope of judicial review of quasi-legislative administrative action is well settled.[4] (See, e.g., *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 29 [160 Cal.Rptr. 710, 603 P.2d 1306]; *Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d

---

[4]The issuance of the Priorities, which were rules generally applicable to all spending decisions within their scope, was clearly a quasi-legislative act. (See *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].)

697].) ■ To be valid, such administrative action must be within the scope of authority conferred by the enabling statute. (Gov. Code, §§ 11342.1, 11342.2; *Morris, supra,* at p. 748.) We have long recognized, of course, that "the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight . . . ." (*Morris, supra,* at p. 748.) Nevertheless, "[w]hatever the force of administrative construction, . . . final responsibility for the interpretation of the law rests with the courts." (*Whitcomb Hotel* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405]; accord, *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 499 [159 Cal.Rptr. 494, 601 P.2d 1030]; *Morris, supra,* 67 Cal.2d at p. 748.) ■ If, in interpreting the statute, the court determines that the administrative action under attack has, in effect, "alter[ed] or amend[ed] the statute or enlarge[d] or impair[ed] its scope," it must be declared void. (*Morris, supra,* at p. 748; accord, *J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 29.) Thus, if the court concludes that the administrative action transgresses the agency's statutory authority, it need not proceed to review the action for abuse of discretion; in such a case, there is simply no discretion to abuse. (*Morris, supra,* 67 Cal.2d at p. 748; see *Whitcomb Hotel* v. *Cal. Emp. Com., supra,* 24 Cal.2d at p. 759.)

■ Administrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void. (*California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 455 [93 Cal.Rptr. 758, 482 P.2d 670]; *Morris, supra,* 67 Cal.2d at p. 737.) ■ Although we give weight to the construction of the Lanterman Act by DDS, we nevertheless conclude that the Priorities are not authorized by the Act, are in fact inconsistent with it, and are therefore void.

■ From our review of the provisions of the Act, we reach the following two conclusions. First, the regional centers and DDS have distinct responsibilities in the statutory scheme: that of the regional centers is to provide each developmentally disabled person with the services to which he is entitled under the Act; that of DDS is to promote the cost-effectiveness of the operations of the regional centers, but not to control the manner in which they provide services. Second, the Act defines a basic right and a corresponding basic obligation: the right which it grants to the developmentally disabled person is to be provided with services that enable him to live a more independent and productive life in the community; the obligation which it imposes on the state is to provide such services.

■ From these conclusions it follows that the Priorities are void on each of two grounds. First, an administrative agency has only such authority

as has been conferred on it. (E.g., *Ferdig* v. *State Personnel Bd.* (1969) 71 Cal.2d 96, 103 [77 Cal.Rptr. 224, 453 P.2d 728]; *United States F. & G. Co.* v. *Superior Court* (1931) 214 Cal. 468, 471 [6 P.2d 243].) As we have explained, DDS is without authority under the Lanterman Act to control the manner in which the regional centers provide services or to control their operations. Yet this is precisely what DDS attempted to do through the issuance of the Priorities, which *directed* the regional centers in effect to cut back on services by category, without regard to the individual client's IPP. Because DDS transgressed its authority in issuing the Priorities, they are void. (*Morris, supra,* 67 Cal.2d at p. 748.)

Second, even if arguendo DDS had authority under the Lanterman Act to issue directives to the regional centers concerning the provision of services or the operation of their programs, it clearly did not have authority to issue the kind of directives involved here. Administrative action must be consistent with the enabling statute. (See *California Welfare Rights Organization* v. *Carleson, supra,* 4 Cal.3d 445, 455; *Morris, supra,* 67 Cal.2d at p. 737.) The Priorities are not. It is through the IPP procedure that the right the Act grants to each developmentally disabled person and the obligation it imposes on the state are implemented; through it, the developmentally disabled person on an individual basis receives, as an entitlement, services that enable him to live a more independent and productive life in the community. By requiring the regional centers in effect to cut back on services by category without regard to the individual client's IPP, the Priorities would have vitiated the IPP procedure, and with it the rights and obligations the Act defines. Because they would have radically altered the Lanterman Act and greatly impaired its scope, the Priorities are void. (*J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 29; *Morris, supra,* 67 Cal.2d at p. 748.)

To avoid this result, defendants first contend the Lanterman Act does not grant developmentally disabled persons the right to any services at state expense, or if it does, it is only to such services as may be provided within the limits of the annual legislative appropriation; and second, that the Budget Act of 1982 authorized the issuance of the Priorities. Both points are without merit.

Defendants argue, by a *reductio ad absurdum,* that the Act does not grant the right to any services at state expense. If the Act, which fails to establish a maximum of services (in dollar value or otherwise) to which the developmentally disabled person is entitled, is construed to grant the right to *any* services at state expense, defendants contend it must be construed to grant the right to all conceivable services at such expense, an improvident result.

■ It is simply not the case that the Act fails to establish a maximum of services to which the developmentally disabled person is entitled. Giving the Act "a reasonable construction which conforms to the apparent purpose and intention of the lawmakers" (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617]), we conclude that it grants the developmentally disabled person the right to be provided at state expense with only such services as are consistent with its purpose. In any event, the Act clearly defines the right of the developmentally disabled person to be provided with services and the corresponding obligation of the state to provide them. Indeed, sections 4501 and 4502 clearly speak in terms of the *responsibility* of the state and the *rights* of persons with developmental disabilities. (See also §§ 4620, 4646-4648.) We must therefore reject defendants' argument that the Act does not grant the right to any services at state expense.

Defendants next insist that if the Lanterman Act grants the right to any services, it grants the right to only such services as DDS can equitably provide to all eligible persons within the limits of the annual legislative appropriation. If the Legislature had intended so to limit rights and obligations under the Act, however, it would have said so; it unquestionably knew the words to employ. Not only did it use them in the context, for example, of the In-home Supportive Services Program (§ 12302), the Medi-Cal Program (§§ 14105, subd. (c), 14120, subd. (c)), and the Habilitative Services Program (§ 19350), which is closely related to the Lanterman Act, it has recently considered and rejected them in the context of the Lanterman Act itself (Sen. Amend. to Sen. Bill No. 1379 (1984-1985 Reg. Sess.) May 10, 1984; Assem. Amend. to Sen. Bill No. 1379 (1984-1985 Reg. Sess.) May 29, 1984).

■ To be sure, as defendants contend, the regional centers may spend no more money to provide services than the Legislature has appropriated. Contrary to defendants' apparent belief, however, this fact does not mean that the Act grants no right to any services at state expense, or that it grants the right to only such services as DDS can equitably provide to all eligible persons within the limits of the annual legislative appropriation. What it does mean, rather, is that so long as funds remain, the right must be implemented in full; as soon as they are exhausted, it can no longer be implemented, but may be financed through an additional appropriation if the Legislature so chooses. (See *California Welfare Rights Organization* v. *Carleson, supra,* 4 Cal.3d 445, 454-459; *Morris, supra,* 67 Cal.2d at pp. 750-754.)

■ Defendants finally urge that the Budget Act of 1982 authorized the issuance of the Priorities. The contention is untenable. The Budget Act

provides in relevant part that the Director "shall establish priorities for expenditure of funds [by the regional centers]. These priorities, insofar as possible, shall be consistent with the Lanterman Developmental Disabilities Services Act, and, when formally transmitted to regional centers by the Director of the Department of Developmental Services, shall govern the authorization for and expenditure of these funds." (Stats. 1982, ch. 326, § 4300-101-001, p. 1222.) Although not a model of clarity, this language appears simply to instruct the Director to offer the regional centers guidance in determining how they may spend the funds appropriated to them in the most cost-effective manner.

Even if this language were ambiguous, we would not read it in any other way. ■■■ When faced with a statute reasonably susceptible of two or more interpretations, of which at least one raises constitutional questions, we should construe it in a manner that avoids *any* doubt about its validity. (E.g., *United States* ex rel. *Atty. Gen.* v. *Delaware & Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 848-849, 29 S.Ct. 527]; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 147 [197 Cal.Rptr. 79, 672 P.2d 862]; see *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) ■■■ Construed as defendants urge, this language would raise serious constitutional questions under the single subject rule, which provides: "A statute shall embrace but one subject, which shall be expressed in its title." (Cal. Const., art. IV, § 9.) When the Attorney General was considering whether similar language in the Budget Act of 1981 authorized the issuance of binding spending "guidelines," he reasoned as follows: under this rule, " 'the budget bill may deal only with the one subject of appropriations to support the annual budget,' " and thus " 'may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess' " or to " 'substantively amend[] and chang[e] existing statute law.' " (64 Ops.Cal.Atty.Gen., *supra*, 910, 917.) On this rationale, he concluded that the Budget Act of 1981, construed so as to uphold its constitutionality, did not grant DDS the authority to impose binding spending "guidelines" on the regional centers concerning the provision of services or the operation of their programs. (*Id.* at p. 918.)

In order to avoid any doubt about the validity of the Budget Act, we decline to construe it as defendants urge. The Budget Act, therefore, does not change the result: the purported Priorities are void.

We recognize that through no apparent fault of his own the Director found himself in a difficult posture in fiscal year 1982-1983—a position in which he had found himself earlier and may one day find himself again: he was

obligated to oversee the implementation of a statutory scheme that granted certain rights but he was not given sufficient funds to fully implement those rights through the end of the fiscal year. This is the same position in which the Social Welfare Director found himself with regard to the aid to families with dependent children (AFDC) program in *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445 [93 Cal.Rptr. 758, 482 P.2d 670]. In that case we held that the Social Welfare Director could not prevent a shortfall by in effect altering the statute to give recipients anything less than the Legislature had granted. We explained that "[i]f the specific appropriation is exhausted before the end of [the] fiscal [year] . . ., then solution of any resulting AFDC crisis should be sought from the Legislature which may either provide supplemental specific appropriations for the program or if need be may authorize [a reduction in entitlement] in order to accommodate fiscal realities." (*Id.* at p. 458.)

Here, fearing a shortfall, the Director could have sought similar relief from the Legislature, which could have resolved the crisis by appropriating more funds or reducing the entitlement by amending the Lanterman Act. He should not have attempted to prevent the shortfall by administratively altering the Act to give developmentally disabled persons anything less than the Legislature provided in sections 4501, 4502 et seq.

The order granting the preliminary injunction is affirmed.[5]

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

---

[5]Because we have concluded that the Priorities are void as violative of the Lanterman Act, we need not reach the other issues raised by plaintiffs, viz., whether they are void as violative of DDS's own regulations, the California Constitution, or the Administrative Procedure Act.