[No. C003809. Third Dist. July 31, 1989.]

HOPE REHABILITATION SERVICES, Plaintiff and Appellant, v. DEPARTMENT OF REHABILITATION, Defendant and Respondent.

COUNSEL

David Rosenberg and Diepenbrock, Wulff, Plant & Hannegan for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Charlton D. Holland, Assistant Attorney General, Elizabeth C. Brandt and Barbara Haukedalen, Deputy Attorneys General, for Defendant and Respondent.

OPINION

EVANS, Acting P. J.—Hope Rehabilitation Services (Hope) appeals from a judgment denying its petition for a writ of administrative mandate. The petition sought to overturn audit findings by the Department of Rehabilitation (Department) that required Hope to reimburse the Department $152,039.51. Hope contends the superior court should have applied the independent judgment test rather than the substantial evidence test in reviewing the Department's decision and that, even assuming the substantial evidence test applies, the Department's findings are not supported by the evidence. Alternatively, Hope contends that the audit findings should be disallowed by the doctrine of administrative laches and that, in any event, the audit findings result in an inequitable rate of payment to Hope for the habilitation services it provides. We find no merit in any of Hope's contentions and affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

Hope is a private, nonprofit public benefit corporation that provides habilitation services to developmentally disabled adults and, through work-

activity programs (e.g., sheltered workshops) at six facilities, prepares and maintains its clients at their highest level of vocational functioning. (See Welf. & Inst. Code, § 19352.)

The Department contracts with facilities such as Hope and funds the habilitation services component (service costs) of their programs. (See Welf. & Inst. Code, § 19355.) Funded services include counseling and training to develop, maintain, and increase client proficiency in work skills and behaviors; services designed to prepare the client for competitive employment; trade training; and work evaluation. Costs incurred by the facility from the production of goods (production costs) are generally not compensable, as these work-activity programs generate revenues. However, because the productivity rate in these programs is lower than that of regular workers in competitive employment, indirect production costs are compensable to the extent that the average productivity rate for the program is lower than the norm for workers in competitive employment. Thus, if a program's clients produce, on the average, at a rate 75 percent below the norm, 75 percent of the program's indirect production costs are compensable.

For each fiscal year, the Department establishes a daily rate at which the vendor facility will be paid for habilitation services. That rate is based upon data supplied by the facility in a cost statement submitted for a prior fiscal year.

A facility's cost statement includes what is called a space utilization report, which allocates, by cost center (e.g., administration, services, production), the use of a facility's floor space. The allocation is based upon "the primary use" of the space (e.g., all of the area used for production is allocated to the production cost center). The "only exception" may be an area evenly designated for two specific purposes (e.g., production in the morning and classroom activities in the afternoon), which may be distributed one-half to each cost center and "shall be supported by proper documentation."

In the "traditional" work-activity program, work areas are devoted exclusively to production at any particular time. Hope operates differently, however, melding habilitation services and production in its work areas, as needed. Thus, if a client is, for example, acting out or experiencing a problem on the work floor, counseling may be provided on the spot rather than removing the client to another area of the facility for intervention. In this respect, Hope's model is considered progressive, as reflected in its higher-than-average client productivity rate.

Hope's space utilization report in its 1982-1983 cost statement allocated certain percentages of its facilities' work areas to the service cost center. The Department used the 1982-1983 cost statement to, in turn, establish Hope's daily rate for the 1984-1985 fiscal year.

In July 1985, the Department notified Hope that Hope's 1982-1983 cost statement was to be audited. The audit was concluded in February 1986, and resulted in findings that Hope had overstated in its service cost center the primary use of the facilities' work areas and that, accordingly, Hope had been overpaid for the 1984-1985 fiscal year. Hope's rates were adjusted to compensate for the overpayment.

The Department's audit review committee denied Hope's appeal, and Hope sought administrative review. Following a hearing, the audit findings were affirmed in the amount of $152,039.51, and the hearing officer's decision was adopted by the Department as its own. Concluding that substantial evidence supported the Department's decision, the superior court denied Hope's petition for a writ of mandate, and this appeal followed.

DISCUSSION

I

■ Hope contends the superior court erred in applying the substantial evidence test to its review of the Department's decision. Hope argues that, because the audit results would cause Hope to curtail its services to the developmentally disabled, and because the developmentally disabled have a fundamental vested right to habilitation services, the superior court should have exercised its independent judgment. We disagree.

In *Pacific Coast Medical Enterprises* v. *Department of Benefit Payments* (1983) 140 Cal.App.3d 197 [189 Cal.Rptr. 558], the Department of Benefit Payments audited a health care provider (PCME) and denied PCME's claim to reimbursement for certain services provided to Medi-Cal beneficiaries. The court held it was error to have afforded PCME a limited trial de novo in the superior court on its petition for writ of mandate: "In the case before us the Department [of Benefit Payments] was dealing with PCME's application for reimbursement of provider costs. While the agency's determination cannot be said to be without economic impact, PCME had no *vested* right to reimbursement. Its application for such reimbursement was not unlike an application for any other governmental benefit, and

the determination respecting PCME's eligibility for such reimbursement is the type of decision as to which courts have traditionally deferred to the administrative agency's expertise by applying the substantial evidence test on review." (Italics in original, p. 208.) By the same reasoning, the Department's audit findings in this case were subject in the superior court to only substantial evidence review.

Hope urges us to consider the impact of the Department's decision on Hope's ability to continue providing services to the developmentally disabled. Hope cites *Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384 [211 Cal.Rptr. 758, 696 P.2d 150], for the proposition that the developmentally disabled in this state have a fundamental vested right to habilitation services. It follows, Hope argues, that if the results of a departmental audit would cause a provider to curtail its services to the developmentally disabled, an administrative decision upholding the audit results affects fundamental vested rights and should be subject to independent judgment review. Hope does not suggest, however, that, as a result of the Department's decision, any developmentally disabled person has actually been denied a benefit to which he or she was entitled, nor has any such person joined in this action to allege such a denial. Rather, Hope raises the spectre that, in the future, the Department's decision will cause it to curtail services. This assertion is far too speculative to justify independent judgment review. Moreover, Hope's argument exaggerates its own importance in the system of delivery of habilitation services in this state. It is the state's obligation to insure that habilitation services are provided to the developmentally disabled. In so doing, the Department contracts with independent service providers and is charged with monitoring and promoting the cost-effectiveness of the providers' operations. (See *Association for Retarded Citizens* v. *Department of Developmental Services, supra,* 38 Cal.3d at pp. 389-390; Welf. & Inst. Code, §§ 4501-4502, 19350.) Thus, the vested right invoked by Hope is between the developmentally disabled and the state, and Hope is a mere facilitator. Should Hope find itself unable to continue providing habilitation services, it does not follow that the developmentally disabled will be denied benefits to which they are entitled; the state is obligated to fill the void.

We conclude that, as no fundamental vested right is at issue here, the superior court did not err in applying the substantial evidence test to its review of the Department's decision.

## II

 Hope contends that substantial evidence does not support the Department's decision. Reviewing the entire administrative record, as we must, in the light most favorable to the Department, we disagree.

The Department's audit review committee acknowledged that Hope's blending of habilitation services and production on its facilities' work floors was "innovative" and "progressive." Hope's allocation of this usage of its work space to the service cost center was disallowed, however, because it did not provide "sufficient quantitative data" to support that allocation. It was Hope's burden to support its allocation in the cost statement submitted to the Department, and the question before the hearing officer was whether this burden had been met and whether the Department properly reallocated the space usage of the areas in question to the production cost center.

Section 4210.2 of the Department's ratesetting manual directs a service provider, in completing the space utilization portion of its cost statement, to "List total utilized square footage of all buildings at the specified address and, based upon the *primary use* of the space, allocate to cost centers (e.g. all of the area used for production is allocated to the production cost center). *The only exception* shall be an area evenly designated for two specific purposes (e.g. production in the morning and classroom activities in the afternoon) which can be distributed one-half to each cost center and *shall be supported by proper documentation*." (Italics added.) Section 4210.3, Note 2 of the ratesetting manual provides: "If occupancy expenses are allocated directly to the cost centers, then the Space Utilization Report need not be completed. However, if the Space Utilization Report is not used, the facility shall explain on the form the basis used to allocate occupancy expenses." A certification form submitted with Hope's space utilization report expressed the understanding that "the necessary supporting worksheets and other documentation must be made available for inspection for at least four years from the end of the payment year."

In this case, Hope allocated its occupancy expenses directly to cost centers. The Department's auditor testified that Hope submitted, without verifying documentation, percentages for the allocation of its occupancy costs. Hope was unable, when asked, to provide any basis for the percentages used. Given an opportunity to reconstruct its data, Hope submitted floor plans and narratives regarding the primary use of the space in question. The

narratives contained percentages of downtime, or time when, for one reason or another, production could not proceed. When asked for the basis of these downtime percentages, Hope said they were only estimates. In addition to floor plans and narratives, the auditor relied on physical tours of the facilities and on interviews with staff members. The tours were conducted in November and December of 1985, when the facilities were busy with production for the Christmas season. The auditor was informed by staff members that production was lower in fiscal year 1982-1983, the year being audited, although the use of the work areas was essentially the same. Nonetheless, Hope was unable to provide any documentation that the *primary* use of the work areas in fiscal year 1982-1983 was habilitation services rather than production.

Hope emphasized the unique nature of its program in that, instead of removing clients from the work floor when behavioral problems arise, it provides intervention services on the spot. Nonetheless, production on the work floor would not necessarily come to a halt because one or several clients might, for example, be acting out. Hope also emphasized that the Department had represented to it that if *any* production occurred on a particular floor space then the Department would allocate the use of that space to production only. This was contradicted, however, by Department witnesses, who testified that "primary use" means greater than 50-percent use. There was also evidence that the Department had permitted Hope, as to other areas of its facilities, to allocate the primary use to the service cost center, although those areas were also used at times for production activities.

In the absence of verifiable documentation to support the disputed allocation of Hope's floor space, the essential issue in this case became the credibility and plausibility of the evidence. The hearing officer consistently found Hope's position to have been unpersuasive, and we may not second-guess his assessment in that regard. Hope argues that substantial evidence supports its position that the primary use of the space in issue was habilitation rather than production. But that misstates the issue. The issue is whether substantial evidence supports the Department's decision that Hope failed to adequately document its position; whether the evidence could just as readily support an opposite conclusion is irrelevant under the applicable standard of review.

Hope contends that if the Department required documentation of space usage beyond floor plans and narratives, then it erred in refusing to allow

Hope to conduct current staff time studies and relate them back to the audited year. There is nothing in the record, however, to indicate that Hope, at the time of the audit, offered to prepare such time studies and was rebuffed by the Department. In any event, staff time studies are used only to allocate staff salaries and fringe benefits and are generally inappropriate to the issue of space allocation. There is no support for Hope's contention that the Department permits other facilities to conduct staff time studies for the purpose of determining space allocation.

Hope contends that the only alternative documentation it could provide to support its allocation of space would be client time sheets for the areas in question and that, because of the "horrendous" amount of time and calculation involved in preparing such documentation, it is an abuse of discretion for the Department to require such documentation. The Department does not "require" such documentation, however. Nonetheless, in light of the unique nature of Hope's program and the inherent difficulty involved in quantifying space usage in such a program, it does not appear unreasonable to expect Hope to make the extra effort required to document its space allocations. ■ Indeed, between the time of the administrative hearing and the hearing on the writ petition, Hope did prepare a summary of its client time sheets for the audited year and asked the trial court to remand the case to the Department for reconsideration in light of the "new" evidence that, "in the exercise of reasonable diligence," could not have been produced at the administrative hearing. (See Code Civ. Proc., § 1094.5, subd. (e).) The trial court properly denied that request, finding the evidence was always available to Hope and that, if Hope needed more preparation time between the audit review committee's denial of its appeal and the time of the administrative hearing, it was incumbent upon Hope to have first requested a continuance of the administrative hearing. (See *Akopiantz* v. *Board of Medical Examiners* (1961) 190 Cal.App.2d 81, 93 [11 Cal.Rptr. 810].)[1] Moreover, Hope candidly admitted to the trial court that it did not consider proffering the documentation at the administrative hearing because "We believed that the evidence that we had presented in terms of both the documents and the oral testimony was sufficient."

---

[1] In this regard, we decline Hope's request that we take judicial notice of correspondence between it and the Department, appended to Hope's brief, in which the Department denied Hope's request that, pending appeal of the audit results, recovery of the overpayment be stayed. The correspondence does not mention the need to compile additional documentation as the basis for the request; it cites only financial hardship. In any event, and aside from its irrelevancy, such correspondence is not the proper subject of judicial notice. (See Evid. Code, §§ 451-452.)

■ Hope contends the hearing officer erred in concluding that "The purpose of space utilization reports is to establish client functioning within the defined space." Hope argues that the Department's ratesetting manual, in determining space allocation, also contemplates staff functioning within a given space and that, accordingly, the hearing officer's approach to his determination of the issue was too narrow. In the context of this case, however, in which Hope's staff-to-client ratio is one to twenty on the workshop floors, it is clear that client functioning in those areas controls the "primary" use of that space.

In a related vein, we reject Hope's contention that staff salary allocations for functions performed in the workshop areas are relevant to space utilization. Neither the hearing officer nor the trial court erred in excluding proffered evidence of the Department's position on allocation of staff salary when staff is working on production floors.

## III

■ Hope contends that the Department unreasonably delayed its audit and that the audit results should therefore be disallowed by the doctrine of administrative laches. Again, we disagree.

■ The doctrine of laches applies in administrative proceedings when the challenged administrative action has been unreasonably delayed, resulting in prejudice to the party against whom the action was taken. (*Brown* v. *State Personnel Bd.* (1985) 166 Cal.App.3d 1151, 1158-1159 [213 Cal.Rptr. 53].) "Because of the relationship between prejudice and delay the circumstances which give rise to laches vary widely depending upon their interplay in the specific case." (*Id.,* at p. 1159.)

■ Section 7040 of the Department's ratesetting manual provides: "To the extent possible, the Department shall conduct reviews and formal field audits prior to the beginning of the payment year to avoid overpayments or underpayments." In this case, however, the Department notified Hope of the audit on July 29, 1985, a little more than one year after the beginning of the 1984-1985 payment year. Hope argues that, having failed to follow its own guidelines on the timing of audits, the Department must be found, as a matter of law, to have unreasonably delayed the audit. Section 7040 of the ratesetting manual is not framed as a statute of limitations, however, defining the outer limit of reasonable delay in determining laches. (Cf. *Brown* v. *State Personnel Bd., supra,* 166 Cal.App.3d at pp. 1159-1160.)

Indeed, section 7045 of the ratesetting manual permits the Department to initiate an audit for, as here, a prior fiscal year. And section 7020, relating to departmental audits, requires the facility to retain its cost statement data and supporting documentation for at least four years after the payment year. Thus, the Department's regulations, while expressing a preference for audits before the payment year, recognize that such early audits may not always be possible and contemplate and authorize audits as much as four years after the payment year. We find no unreasonable delay of the audit in this case.

Hope contends that it was prejudiced by the Department's late audit because Hope entered into collective bargaining agreements and long-term lease arrangements in reliance on the unaudited rate. The hearing officer excluded proffered evidence on this point on the ground it was only marginally relevant. In his decision, however, the hearing officer concluded that "[Hope's] reliance on the former unaudited rate to establish new lease and labor agreements does not compel equitable relief." The trial court found that the evidence was relevant and should have been admitted but that, in light of the hearing officer's conclusion showing he had considered the evidence anyway, it would have been a futile act to remand the case for reconsideration. We agree. Even assuming the relevance of the evidence in establishing prejudicial reliance on the Department's delay, the key element that is missing, as a matter of law, is that any such reliance by Hope was justifiable. On notice by the Department's ratesetting manual that it was subject to audit for prior fiscal years and that it must retain the documentation supporting the cost statements for at least four years, Hope cannot be said to have been justified, in July of 1985, in relying on the unaudited rate for the 1984-1985 payment year.

IV

Welfare and Institutions Code section 19356, subdivision (a), provides: "The department shall promulgate regulations to establish rates subject to the approval of the Department of Finance. The regulations shall provide for an equitable ratesetting procedure in which each specific allowable service, activity, and provider administrative cost comprising an overall habilitation service, as determined by the department, reflects the reasonable cost of service." ■ Citing the uniqueness of its program model and the threat that it may have to shut down or curtail those programs if the audit is upheld, Hope contends that the audit findings result in an inequitable rate, contrary to Welfare and Institutions Code section 19356. Hope mis-

construes the nature of the equities addressed by the statute; what must be equitable is the ratesetting *procedure*. Thus, section 2020 of the Department's ratesetting manual provides: "The policies and procedures the [Habilitation Services Program] employs to establish rates shall be equitable. This means that for all facilities the [Habilitation Services Program] shall require that the same type of Cost Statement data be reported in the same form and that the [Habilitation Services Program] apply all of its ratesetting policies and procedures in the same manner." Hope does not suggest that the Department applied its policies and procedures any differently in this case than in any other. Accordingly, Hope cannot complain of inequitable treatment.

The thrust of Hope's argument is that because it is a unique and progressive program, it should be excepted from the Department's ratesetting procedures in order to take its program model into account. This would be contrary to statute and departmental regulations, however, and Hope's remedy for this perceived inequity lies in another forum.

Our previously issued stay of execution of the Department's decision is vacated. The judgment is affirmed.

Sparks, J., and Davis, J., concurred.