Filed 1/14/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Eli B. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>R.B. et al.,<br><br> Defendants and Appellants. | A162116<br><br>(Alameda County<br>Super. Ct. Nos. JD029587-01,<br>JD029588-01) |

  R.B. (father) and R.B. (mother) appeal from an order terminating their parental rights over eight-year-old Eli B. and his sister, seven-year-old A.B., who have been living together in foster care for nearly four years, roughly half of their young lives. The principal issue on appeal is whether the juvenile court erred in declining to apply the beneficial relationship exception concerning either parent. For the following reasons, we affirm the order.

**PRELIMINARY STATEMENT CONCERNING JUSTICIABILITY**

  On November 24, 2021, we filed an unpublished opinion affirming the order terminating parental rights. Before our opinion became final, we received several submissions. Respondent, the Alameda County Social Services Agency (the agency), filed a request that we publish our opinion. In addition, father's counsel filed a motion notifying us that on October 20, 2021,

1

while this appeal was pending, father died; for that reason, father's counsel requested that we dismiss the appeal, vacate the superior court's judgment and remand the case with directions to abate all proceedings. We directed a response to the abatement motion from all parties and, on our own motion, granted rehearing (see Cal. Rules of Court, rule 8.268(a)(1)). Having considered the parties' positions, we will decide this case on its merits.

Father's death has mooted his appeal, which ordinarily would require its dismissal. (See *In re A.Z.* (2010) 190 Cal.App.4th 1177, 1181; see also *In re Meyer's Guardianship* (1947) 79 Cal.App.2d 518, 519; *In re Henry's Estate* (1960) 181 Cal.App.2d 173, 176, 178.) Abating a dependency proceeding, as both father's counsel and mother ask us to do, is not the appropriate disposition when a parent dies pending an appeal of an order terminating their parental rights, including because it would leave the dependent child in legal limbo. (See *In re A.Z.*, at p. 1181.) Nor would it be appropriate to dismiss mother's appeal; only father's appeal is moot. Nevertheless, when an appeal has been mooted by the death of a party, we still have inherent discretion to decide the case on its merits. (*Konig v. Fair Employment and Housing Com'n* (2002) 28 Cal.4th 743, 745, fn.3.) And here, we will exercise our discretion to decide father's appeal because we agree with the agency that this case presents issues of public importance. "The parental-benefit exception is of great importance and one of the most litigated issues in dependency proceedings." (*In re Caden C.* (2021) 11 Cal.5th 614, 629, fn. 3 (*Caden C.*).) Indeed, *Caden C.*, the Supreme Court's seminal decision addressing the beneficial relationship exception, was itself a moot appeal, which our high court addressed on the merits. (See *ibid.*) We now proceed to do the same.

2

## BACKGROUND

In June 2017, Eli and his younger sister A.B. were four years old and two years old, respectively, when they were surrendered to a children's shelter in San Joaquin County by an aunt who reported the parents had abandoned the children with their grandfather who could no longer care for them. The aunt was fearful for her family's safety because, after their grandfather left the children with her, she had received threatening phone calls from father. According to the detention report, the children had been abandoned with a stranger several months earlier, in January 2017, and then stayed briefly with their grandfather before he dropped off the children with the aunt to care for them. The aunt reported the parents were dealing drugs, mother was engaged in prostitution, and the parents had been in Las Vegas and were presently in Atlanta. In an interview with a social worker, four-year-old Eli reported that his parents "don't want me. They kicked me out; they fired me and kicked me out." He also reported that his parents would punch him, hit him and call him derogatory names (such as "the 'F-word,'" a "bitch" and a "punk").

The children were taken into protective custody, and on June 28, 2017, child welfare authorities in San Joaquin County filed a dependency petition on behalf of both children. It alleged the parents had failed to supervise or protect the children, and also failed to provide them with adequate food, clothing and shelter (Welf. & Inst. Code, § 300, subd. (b)[1]), by leaving them with an unwilling caretaker and by using inappropriate discipline with Eli such as hitting and verbally abusing him; and that the children were

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

exhibiting behaviors indicative of emotional distress, including night terrors and bedwetting.

The children were ordered detained and placed together in foster care, the allegations were subsequently sustained (in October 2017), the children were declared dependents of the court and reunification services were ordered for both parents who were then living in Berkeley, California.

During the reunification period, the case was transferred to Alameda County (in May 2018) where the parents lived, and the children were moved to a new foster home in April 2018 in San Joaquin County.

The parents received 16 months of reunification services, which were terminated on February 27, 2019. Pending the section 366.26 hearing, the juvenile court ordered supervised visitation twice a week for three hours, in Stockton, to be confirmed by text by the parents 24 hours in advance.

The contested section 366.26 hearing proceeded over the course of many sessions, culminating nearly two years later on January 27, 2021, with the order terminating parental rights. By that time, Eli was seven and A.B. was six. The court ruled the beneficial relationship did not apply to either parent and terminated parental rights. We discuss the court's ruling in greater detail as necessary below.

Both parents timely appealed the court's order.

## DISCUSSION

### I.

### *Father's Contentions*

Father challenges the termination of his parental rights over each child on a different ground. As to Eli, he contends the court erred in concluding the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(1)) does not apply. As to his daughter A.B., he invokes the sibling relationship exception.

4

## A. Eli

The beneficial relationship test is an exception to the presumptive rule of terminating parental rights after reunification efforts have failed, in order to free a child for adoption. (*In re J.D.* (2021) 70 Cal.App.5th 833, 852 (*J.D.*).) As noted, the Supreme Court has recently explained its scope and proper application. (See generally *Caden C., supra,* 11 Cal.5th 614.)

As clarified by the Supreme Court, " 'the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.' " (*J.D., supra,* 70 Cal.App.5th at p. 852, quoting *Caden C., supra,* 11 Cal.5th at pp. 636-637.)

We review the juvenile court's ruling on the first two elements for substantial evidence. (*J.D., supra,* 70 Cal.App.5th at p. 853.) We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion. (*Ibid.*)

Here, father frames his appellate argument in many ways but, at bottom, argues the court erred in declining to apply the beneficial relationship exception concerning Eli because the court's ruling is not supported by substantial evidence and/or was an abuse of discretion. He asserts the first element (regular visitation and contact) is not at issue, because the juvenile court made a finding that his visitation was sufficient. Conflating an analysis of the second and third elements, he argues the court erred, rather, by arbitrarily rejecting the uncontradicted bonding study of a "neutral" expert attesting to the existence of a beneficial relationship between himself and Eli that outweighs Eli's need for permanence in an adoptive home. It is unnecessary to address that argument because, as we will explain, father did not meet his burden to prove that he "maintained regular visitation and contact" with Eli, as required. (§ 366.26.26, subd. (c)(1)(B)(i).)

With regard to this first element, father misconstrues the juvenile court's ruling. He asserts the juvenile court "noted that while [he] missed some visits, the court found his visitation and contact was sufficient for purposes of establishing a beneficial relationship." We do not agree. In full, the juvenile court said the following on this issue: "As it relates to the father, [he is] a little more bonded I think with Eli [than mother]. But again the engagement between dad and the children, *his visits were sufficient enough. They were up and down. There were periods of time where he doesn't show up, even within the last month and a half or so; like just kind of radio silence on the visits. That's of concern to the Court.* [¶] But *even if we looked at the visits as if they were totally consistent*, what I didn't see is the children needing that relationship, so meaning that the relationship between dad and the children, so that it would just be devastating to them if that parental relationship was

6

terminated and they went on to adoption.  I just didn't see any evidence of that."  (Italics added.)

In asserting the juvenile court ruled in his favor on the visitation element, father's appellate brief quotes the juvenile court's ruling selectively, omitting the court's expressions of concern about the irregularity of his visits and periods of "radio silence," as well as the court's finding that his visits were not "totally consistent."  Considering the court's comments in full context, it is evident the juvenile court did not rule that father satisfied this element; on the contrary, it expressed significant doubt about the regularity of father's visitation.  At best, its findings about whether father satisfied the first element are ambiguous, which compels us to construe them against father, not the other way around.  " 'It is an established rule of law that the findings of fact are to receive such a construction as will uphold rather than defeat the judgment thereon.  For this purpose they are to be liberally construed, and any ambiguity or inconsistency therein is to be resolved in favor of sustaining the judgment.' "  (*Johndrow v. Thomas* (1947) 31 Cal.2d 202, 208-209; see also *California School Employees Assn. v. King City Union Elementary School Dist.* (1981) 116 Cal.App.3d 695, 702 [appellate court must resolve any uncertainty in trial court findings " ' "so as to support the judgment rather than to defeat it" ' "]; *Richter v. Walker* (1951) 36 Cal.2d 634, 639.)  That is because "[a] ruling by a trial court is presumed correct, and ambiguities are resolved in favor of affirmance."  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631; accord, *Doe v. Superior Court of Los Angeles County* (2021) 71 Cal.App.5th 227, 235 ["an ambiguous or uncertain order should be construed in favor of its validity if possible"].)  Only "[w]hen the record clearly demonstrates what the trial court did" will the reviewing court "not presume it did something different."  (*Lafayette*

*Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1384.)  Here, the record does not *clearly* demonstrate the court resolved this factual issue in father's favor, and father's counsel did not ask the court to clarify its findings.  Accordingly, we must construe the juvenile court's findings on the visitation element in a manner that supports its order terminating father's parental rights—that is, as a finding father did not meet his burden to prove that he "maintained regular visitation and contact" with Eli, as required.  (§ 366.26, subd. (c)(1)(B)(i).)

Substantial evidence supports the juvenile court's adverse finding on this issue.  As explained by the Supreme Court, "The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]  Visits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.'  [Citation.]  Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child." (*Caden C., supra,* 11 Cal.5th at p. 632.)  In other words, the visitation element is to be understood in light of the overall purpose of the beneficial relationship exception.

Here, the record shows father's visitation with his children throughout the years-long dependency proceeding was sporadic and also entailed significant gaps, and that even when he did visit his children he was frequently late.  To give some indication, during the 18 months between the time the children were ordered detained (in June 2017) and the termination of father's reunification services (in February 2019), father was spotty in

8

visiting his children literally from start to finish. In the first month after his children were detained, he missed two of his first four weekly visits. And at the end of the reunification period, he didn't visit with his children for more than four months (between January 19 and May 28, 2019).[2]

After father's reunification services were terminated, his inconsistent visitation persisted. For example, during one five-month reporting period (between August 3, 2019, and January 14, 2020), he missed 12 of 44 bi-weekly visits, including twice having three "no-shows" in a row (in October and again in November 2019). He also was late four times in those five months, by an average of an hour and ten minutes (and once by nearly two hours). When in-person visitation was changed to virtual visitation during the pandemic, there were two months (April and June 2020) in which father missed nearly all of his visits. And then when in-person weekly visitation resumed in September 2020 (supplemented by video visits), father visited his children only four times in four months, skipping far more in-person visits than he attended.[3] Indeed, by father's own calculation in his appellate brief, he missed nearly 40 percent of all visits during the roughly two-year period after his reunification services were terminated (missing 48 and

---

[2] His visits were terminated by the visitation center in January 2019 because of his erratic and aggressive behavior toward staff during a January 19, 2019 visit and after that, when visitation was moved to a different center, he missed visits because he was in Florida for work.

[3] In the roughly four months between the time father was again offered weekly in-person visitation (in September 2020) and the date of the court's ruling, father visited in person with his children three times in October 2020, and then once on December 5, 2020. And even then, he asked to shorten his December 5 visit by 30 minutes. By contrast, he missed: his first in-person visit with them (on September 22), all of his in-person visits in November 2020, three of four in-person visits in December 2020, and both of his in-person visits with them in January 2021.

9

attending 79, from around January 2019 until January 2021). That is hardly taking advantage of visitation " 'to the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.)

There also is substantial evidence father's failure to take regular advantage of his visitation rights adversely impacted his son. (See *Caden C., supra,* 11 Cal.5th at p. 632.) For example, at the end of the reunification period when mother attended weekly visits alone during the four-month period that father missed visitation, the children expressed worry to her about when they would see him again. Eli's foster parent reported the little boy's anger increased during that gap in visitation, and that he was expressing anxiety, disappointment and worry about both parents' inconsistency with visitation. The initial section 366.26 report even noted Eli's foster parent "reported concerns regarding Eli's boundaries, reporting that he will approach and talk to strangers, and has invited a stranger to join them at the park." Later on, in one of the most recent status reports prepared about three months before the court terminated parental rights (dated October 20, 2020), the agency reported that both children were still exhibiting stress over their parents' lack of consistent visitation.

Even father's bonding expert acknowledged in her report that father "has struggled with some visit consistency" during the case (though she opined he had visited regularly "for the most part" for two years). Her report attributed this "primarily" to transportation issues but also suggested that father's drug use "likely . . . is contributing to his difficulties with making appointments on time."[4] The report also acknowledged that father's "issues

---

[4] That opinion was not conjectural. Father showed up high to his appointment with his own bonding expert on the day she evaluated him and

with timeliness and no shows . . . does have a negative impact" on Eli, specifically alluding to "sadness and behavioral issues" Eli exhibited when his father was late to the visits she observed. At the hearing, she testified the impact of father's missed visits was "very disappointing" and "definitely has an impact on the relationship [Eli] has with his father," and acknowledged it even could start to undermine their bond.

The record here is sufficient to sustain the court's findings that father failed to visit regularly with Eli. (See, e.g., *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [affirming order terminating parental rights where there was "ample" evidence parents visited "only sporadically during the first 18 months of the dependency proceedings" even though visits became more regular during final six months before section 366.26 hearing], disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at pp. 637, fn. 6, 638, fn. 7; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [error to apply beneficial relationship exception because "[t]he undisputed evidence is that there was not regular visitation"; although precise number of visits was in conflict, testimony of both mother and social workers established there were "significant lapses in visits"], cited with approval in *Caden C.*, at p. 212.)

In his reply brief, father argues the agency "did not object to the court's finding on the element of visitation," implying the agency has forfeited the ability to argue about the sufficiency of the evidence on this issue. Father cites no authority an objection was required (the cases he cites are not on point) and we are aware of no such principle. On the contrary, an objection to the court's factual findings is not required even for an appellant. (See *Tahoe*

---

admitted to her he had smoked marijuana. He also sometimes attended visits under the influence of, or smelling strongly of, marijuana.

*National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17.) Moreover, as explained above, father has misconstrued the court's ruling. The juvenile court ruled against father on this factual issue, and so we must uphold its determination if supported by substantial evidence. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; cf. *In re Marriage of Rifkin & Carty* (2015) 234 Cal.App.4th 1339, 1342, fn. 1 [where respondent files no brief, appellate court does not treat it as an admission of error and still must " 'independently examine the record and reverse only if prejudicial error is found' "].)

Father also argues in his reply brief that he encountered difficulties to timely attend in-person visits hours away from his home, and that virtual visitation also presented obstacles. We are not insensitive to the fact he lived a great distance from where his children were placed, and that it took hours to reach them by public transportation. That circumstance was certainly not ideal. Yet the record contains evidence the agency regularly provided him with transportation assistance such as BART, bus and Amtrak passes. Nor are we insensitive to the limitations and potential challenges of virtual visitation. But here, father was limited to virtual visitation for about only 15 percent of the time (approximately seven months of a three-and-a-half-year period of visitation, from July 2017 to January 2021). Moreover, the court was entitled to infer that technology issues could not possibly account for his having missed nearly all of his virtual visits two months in a row. Whatever father's proffered reasons for not visiting his children more frequently or more punctually, distance and technology were by no means the only explanations: as noted, even father's expert acknowledged that father's drug use also appeared to be a factor.

In reviewing the juvenile court's ruling we cannot reweigh the evidence or evaluate witness credibility. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) We

must uphold the juvenile court's factual determination as long as it is supported by substantial evidence " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Ibid.*)  That is the case here.

## B.     A.B.

Father's only argument concerning his daughter A.B. is that we should reverse the order terminating his parental rights as to her (under the sibling relationship exception) if the order terminating parental rights as to Eli is reversed.  Because father has not demonstrated the court erred by terminating his parental rights over Eli, his contention concerning A.B. is moot.

## II.

### *Mother's Contentions*

Mother argues the court erred when it found the beneficial relationship inapplicable to her, as to both children.  Alternatively, she contends that if we reverse the order terminating father's parental rights then we also must reinstate hers.  The latter point is moot because, as we have explained, we are affirming the termination of father's rights.  And for the following reasons, the court also did not err in rejecting the beneficial relationship exception on mother's behalf.

Unlike the juvenile court's ruling concerning father, the record clearly shows the court found that mother's visitation *was* sufficient ("her visits were consistent enough").  The court found, however, that, although the children love mother, they have a "conflicted relationship" with her (and with father).  And it ruled that "I did not see any evidence that there was a bond that was sufficient enough to outweigh the need for permanency through adoption."

13

It is unnecessary to address the first element (regular visitation and contact) despite the agency's argument that mother did not prove that element either, because the juvenile court did not err in rejecting the exception on other grounds.

First, substantial evidence supports the juvenile court's determination that mother did not prove the existence of a significant, positive emotional attachment to her by either child. Mother's appellate brief stresses evidence that in many visits the children were happy to see her, engaged with her and even competed for her attention, as well as the fact they love her. But she ignores a great deal of other evidence the juvenile court was entitled to credit that paint a much more complex picture, including occasions on which the children did not engage with her favorably, as well as evidence that her interactions with them sometimes had a negative impact on them. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [second element includes consideration of " 'the "positive" or "negative" effect of interaction between parent and child' "].) For example, their very first visit together (in July 2017) was traumatic: the children were afraid of her, cried, screamed and would not go near her; the notes from that visit are difficult to read. Even later on, after the children had warmed up to resumed contact, there were visits in which mother barely engaged with the children, if at all. Likewise, there were visits in which the children did not interact much with mother, and they often acted out with unmanageable tantrums or misbehavior. The children also sometimes insulted mother; expressed feelings of rejection and abandonment by her, which was exacerbated by her missed visits (such as by asking, " '[W]hy did you give me away?' " or " 'How come you don't want me?' "); expressed anger at her; and refused to say "I love you" or give her hugs. In one visit (in May 2109) in which both children expressed worry to mother

14

about her inconsistent attendance at visits, Eli remarked that, " 'when mommy doesn't come to visits, it's because she's hanging with the villains.' " In another visit (in October 2019), he kicked mother in the head.

These conflicted behaviors persisted throughout the case. During one of mother's most recent in-person visits with the children, on December 1, 2020, which was about two months before the contested section 366.26 hearing concluded, both children were again out of control (they were loud, screaming and hitting each other), and mother could not manage them. Eli blurted out to mother, "I'm done with you" and "I hate you," and he tried to hit her with a jump rope. The visit ended early and mother missed the next one. The social worker testified there were other visits when mother was unable to control Eli's behavior.

Mother's counsel candidly acknowledged in closing argument, Eli "struggles with a lot of complex feelings" concerning mother.

And A.B. had barely ever known mother as a parental figure. The little girl was detained at age two after having been abandoned by her parents five months earlier, and then spent nearly four years in foster care. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [relevant to second element is " '[t]he age of the child [and] the portion of the child's life spent in the parent's custody' "].) Mother's counsel conceded in closing argument A.B. didn't even remember living with mother. A.B. also exhibited significant distress knowing the court case was underway; she remarked multiple times that she wanted her foster parent to decide where she would live and not the judge.[5]

---

[5] To be clear, the *fact* A.B. wanted to live with her foster parent is not relevant because physical custody was not the issue and, as mother points out, a child can certainly have more than one significant, positive emotional attachment, including to a non-primary caretaker. (See *J.D.*, *supra*, 70 Cal.App.5th at p. 859.) But the *fact and level of her distress* is relevant,

15

Also telling, though not dispositive, is the fact mother retained an expert to prepare a bonding study who interviewed the children, but then mother did not introduce a bonding study into evidence because, as her counsel told the court in closing argument, counsel asked the retained expert not to produce a report. The expert's notes from his interviews with the two children were withdrawn from evidence, and so we will not base our decision upon them.[6] Moreover, a bonding study is not always necessary in order to prove the existence of a beneficial relationship (see *In re J.D.*, *supra*, 70 Cal.App.5th at p. 862), and therefore the absence of one standing alone is of no relevance. But here, the fact mother directed her retained bonding expert not to produce a report after he interviewed the children creates an inference the expert concluded neither child had a significant, positive emotional attachment to her.[7] (See *Maaso v. Signer* (2012) 203 Cal.App.4th

because it sheds light on her feelings towards mother more generally, and indicates, as the juvenile court found, her feelings toward mother are conflicted.

[6] The court indicated it had reviewed the notes.

[7] We recognize the juvenile court, when ruling on the admissibility of the expert's notes, indicated it would not be appropriate to draw such an inference were the agency to make such an argument. But the court was free to change its mind. (See *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300-301 [judge's oral comments " 'may never be used to impeach the final order,' " because "the court's final order supersedes the tentative ruling"]; *In re Marcus* (2006) 138 Cal.App.4th 1009, 1016 [oral or tentative ruling is not "necessarily the unequivocal decision of the court," because "[a] court may change its ruling until such time as the ruling is reduced to writing and becomes the [final] order of the court"].) Indulging all presumptions in favor of the court's order, we presume the court did so before rendering its actual decision, after hearing final closing arguments from the parties where the agency raised the inference and mother's counsel argued against it.

362, 371 ["an inference may be drawn from a party's failure to produce available evidence"]; Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust"].)

In light of all of the foregoing, mother has not demonstrated she proved the second element of the beneficial relationship exception as a matter of law.

That alone is sufficient to sustain the court's ruling concerning mother. In addition, though, mother has not demonstrated the juvenile court abused its discretion under the third prong in concluding that the benefits of permanence outweigh the maintenance of the children's relationship with her. Her argument on this point essentially reargues the weight of the evidence and asks us to substitute our judgment for that of the juvenile court, which we cannot do. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 640-641.) Among other facts that could lead a rational decisionmaker to conclude the children were, on balance, better off in a stable, permanent adoptive home than in a guardianship with continued parental contact is extensive evidence that both children were extremely anxious about not knowing where they would live permanently, which adversely impacted them throughout the course of the dependency, both emotionally and behaviorally. Indeed, there is substantial evidence their behaviors improved when in-person visitation was suspended due to the pandemic; and the social worker testified that a permanent plan of legal guardianship would create continued "anxiety and worry" for them, because they would not ever know when and if their parents would try to get them back.

What is more, mother's conduct during the case was unstable. In July 2020, about six months before the section 366.26 hearing concluded, she

17

was arrested after trying to run down father with her car, driving at a speed of 20 miles per hour and while their infant daughter was in the backseat; father sustained injuries, the car was damaged and the domestic violence incident resulted in a CPS referral for that child too, who was eventually taken into protective custody and ordered detained in a separate case. The juvenile court could infer from the violent nature of that incident, as well as the lack of judgment mother displayed on that occasion with a different child, that her anger and inability to control her aggression could potentially have a detrimental influence on Eli's and A.B.'s mental health, if not also their physical safety were she ever to expose them to continued domestic violence.

In light of all of these circumstances, we cannot conclude the juvenile court had no discretion to weigh the harms and benefits of terminating mother's parental rights in the manner that it did, even if the children did have a significant, positive emotional bond to her.

## DISPOSITION

The order terminating both parents' parental rights is affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, J.*

_____
RICHMAN, Acting P.J.

*In re Eli B.* (A162116)

---

\* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19

Trial Court:Alameda County Superior Court

Trial Judge:  Hon. Ursula Jones Dickson

Counsel:

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Mother R.B.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant Father R.B.

Donna R. Ziegler, County Counsel, Samantha Stonework-Hand, Deputy County Counsel, Hannah L. Reed, Associate County Counsel, for Plaintiff and Respondent.